(296 P.3d 439)
No. 106,988

JASON MICHAELIS, *Appellee*, v. GERALD and PEGGY FARRELL, *Appellants*.

Opinion filed March 8, 2013.

*Ian M. Bartalos* and *Charles A. Edgeller*, of McCausland Barrett & Bartalos P.C., of Kansas City, Missouri, for appellants.

*Gary Mardian*, of Kansas City, Missouri, and *Jonathan M. Soper*, of Humphrey, Farrington & McClain, P.C., of Independence, Missouri, for appellee.

Before ARNOLD-BURGER, P.J., GREEN, J. and HEBERT, S.J.

GREEN, J.: This litigation arises out of a negligence action where the plaintiff, Jason Michaelis, sued the defendants, Gerald Farrell and Peggy Farrell, for an electrical shock he suffered while at the defendant's property. A jury allowed recovery on plaintiff's claim. Moreover, the jury determined that Michaelis did not reasonably ascertain that he had sustained substantial injury until 5 years after receiving the electrical shock, which allowed him to overcome the applicable 2-year statute of limitations hurdle. On appeal, the Farrells contend that the trial court erred in denying their posttrial motions, arguing (1) that Michaelis was barred from bringing his action under the applicable 2-year statute of limitations, and (2) that jury instruction 8 misstated the law regarding this issue. We disagree. Accordingly, we affirm.

Michaelis' plans were to spend the Fourth of July holiday with his mother and stepfather at their lake home in Climax Spring, Missouri. Michaelis' stepfather had been experiencing problems with the boat lift on his dock, and he asked Michaelis, an electrician, to bring his tools when he came to the lake. While at the lake house on the morning of July 2, 2005, Michaelis answered a knock on the door. A woman was frantic because what she thought was a dead dog was floating in the lake. When Michaelis walked down to the dock, he saw another man was about to enter the water. As the man stepped onto a ramp, he fell in the water. Michaelis stated he understood the man to say he was being "electrocuted." Michaelis thought the dock was electrified so he told the man to move away from the dock. The man let go of the dock and disappeared under the water. The man's daughter was present and asked Michaelis to save her father. Michaelis still believed the dock was conducting a current so he assumed if he jumped in the water far enough from the dock he would avoid getting shocked. Michaelis jumped in the lake and was immediately aware the water had become electrified and he was getting shocked. Right before Michaelis jumped in the lake, he had yelled for someone to cut off the electricity, and the next thing he knew, he had popped out of the water.

Michaelis testified that after the power was shut off, his body felt like it had been through a workout; his body felt numb and

was tingling. But other than those sensations, Michaelis thought he was fine. Everyone survived the electrified water, including the dog.

Beyond what he described as "nerves" after returning to work as an electrician, Michaelis did not initially note any difficulties. Over time, however, he began experiencing problems with memory and concentration which became progressively worse over the years. In March 2007, he consulted Dr. George Wurster, a psychiatrist, for severe overwhelming anxiety. Dr. Wurster was aware that Michaelis had suffered an electrical shock in 2005, but it was not until late 2009 that the doctor noted possible central nervous system syndrome secondary to the electrical shock. Dr. Wurster referred Michaelis to Dr. Sandi Isaacson, a neuropsychologist, to help ascertain if Michaelis had suffered neurological injury because of the electrical shock. After testing Michaelis in March 2010, Dr. Isaacson concluded he had suffered a neurocognitive brain dysfunction as a result of the electrical shock. Michaelis sued the Farrells for negligence on July 2, 2010.

The Farrells moved for summary judgment arguing that, as a matter of law, Michaelis suffered an injury immediately after the accident, or soon thereafter, when Michaelis was experiencing the problems he was having. Accordingly, the Farrells maintained that Michaelis' suit was barred by the 2-year statute of limitations. The trial court denied the motion, finding there was a genuine issue of material fact as to when Michaelis reasonably ascertained he had suffered substantial injury caused by the electrical accident.

The matter went to trial and the jury awarded total damages of $120,412 and assigned comparative fault at 50% for the Farrells and 50% for Michaelis. As a result, the damages assessed against the Farrells totaled $60,206. In answer to the question asking on what date did Michaelis reasonably ascertain he suffered a substantial injury, the jury verdict stated: "Spring 2010."

Although Michaelis filed his petition in Johnson County, Kansas, where the parties resided, Missouri law applied to the cause of action. Thus, Michaelis was still entitled to recover damages despite the jury finding him equally at fault. See Mo. Rev. Stat. § 537.765.2 (2000) ("Any fault chargeable to the plaintiff shall di-

minish proportionately the amount awarded as compensatory damages but shall not bar recovery."); *cf.* K.S.A. 60-258a(a) (the plaintiff's contributory negligence does not bar recovery as long as that party's fault is less than the causal negligence of the defendant). Nevertheless, the Farrells' statute of limitations defense was governed by Kansas statutory law.

*Did the trial court err in denying the Farrells' posttrial motions for directed verdict and judgment as a matter of law as to their statute of limitations defense?*

The Farrells moved for a directed verdict on their statute of limitations defense during trial and timely renewed the motion after entry of judgment under K.S.A. 2012 Supp. 60-250(b). The Farrells argued that there was no genuine issue of material fact regarding when Michaelis suffered an actionable injury as a result of the accident on July 2, 2005, and Michaelis filed his action outside the permissible 2-year statute of limitations in K.S.A. 60-513(b). In their motion, the Farrells maintained that the evidence showed Michaelis suffered an immediate shock and pain when he entered the water, and soon after the accident, Michaelis reported anxiety about continuing his employment as an electrician. The Farrells further contended that Michaelis' problems following the accident—trouble comprehending blueprints and issues with concentration and anxiety—were associated by both Michaelis and his psychiatrist, Dr. Wurster, with the electrical accident. The Farrells maintained Dr. Isaacson's 2010 diagnosis was merely verification of the extent of Michaelis' injuries, which is not the standard to determine when there was objective knowledge of the injury.

The trial court found the issue of when Michaelis reasonably ascertained he suffered an injury as a result of the accident was similar to the case of *Gilger v. Lee Constr., Inc.*, 249 Kan. 307, 820 P.2d 390 (1991). As in *Gilger,* the trial court found there were disputed facts regarding when Michaelis realized his injury was connected with the electric shock. Consequently, the trial court determined this was a fact question for the jury.

*Standard of Review*

Our Supreme Court in *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 267, 225 P.3d 707 (2010), provides the following standard of review regarding a motion for judgment as a matter of law (formerly a directed verdict) under K.S.A. 2012 Supp. 60-250:

"Appellate courts apply the same standard as trial courts when considering a motion for directed verdict, now known as a judgment as a matter of law under K.S.A. 60-250. See *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 40, 169 P.3d 1052 (2007).

" ' " 'When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict.' " [Citations omitted.]' 285 Kan. at 40.

"Stated another way, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); see, *e.g.*, *Smith*, 285 Kan. at 40 ('In other words, a motion for judgment as a matter of law must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party.')."

*Analysis*

K.S.A. 60-513(a)(4) provides that an "action for injury to the rights of another, not arising on contract, and not herein enumerated" shall be brought within 2 years. K.S.A. 60-513(b) provides, in relevant part:

"[T]he causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

On appeal, the Farrells contend that K.S.A. 60-513(b) presents two alterative bases to determine if a cause of action has accrued, which they arbitrarily label the "threshold standard" and the "al-

ternative standard." The Farrells maintain that throughout the case, the trial court failed to consider the "threshold standard"— an action is deemed to have accrued when the act first causes substantial injury—which would have entitled them to judgment as a matter of law. According to the Farrells, the trial court wrongly found the fact of injury was not reasonably ascertainable until sometime after the accident by addressing only the "alternative standard."

In response, Michaelis claims that this issue is raised for the first time on appeal and, further, that the Farrells offer no authority to support a two-part distinction in K.S.A. 60-513(b). As a result, Michaelis contends that this issue is waived. But the Farrells contend that they were merely providing a way to differentiate the two alternatives bases from which a trial court could determine when a cause of action accrues; this was not a new argument. The Farrells maintain that from the beginning they argued the electric shock accident immediately gave rise to substantial injury and that, had the trial court considered the first basis for accrual, it would have held that Michaelis suffered substantial injury on July 2, 2005.

The Farrells seem to be arguing that the trial court erred in submitting this issue to the jury because the electric shock caused substantial injury to Michaelis on July 2, 2005, or soon thereafter, as a matter of law. There is no indication that the trial court did not consider if the negligent act caused substantial injury when Michaelis received the electric shock. Rather, the trial court found this was a disputed question of fact. The trial judge stated, "I can see the arguments [whether there was actionable injury immediately after the incident or not until years later] both ways."

*Caselaw*

The statute of limitations starts to run in a tort action when the act first causes "substantial injury." K.S.A. 60-513(b). Kansas courts have interpreted the phrase "substantial injury" to mean "actionable injury." *Roe v. Diefendorf*, 236 Kan. 218, Syl. ¶ 2, 689 P.2d 855 (1984). "The rule which has developed is: The statute of limitations starts to run in a tort action at the time a negligent act causes injury if both the act and the resulting injury are reasonably

ascertainable by the injured person." 236 Kan. at 222. "[T]he term 'reasonably ascertainable' . . . suggests an objective standard based upon an examination of the surrounding circumstances." *P.W.P. v. L.S.*, 266 Kan. 417, 425, 969 P.2d 896 (1998).

"Inherent in 'to ascertain' is 'to investigate.' " *Davidson v. Denning*, 259 Kan. 659, 675, 914 P.2d 936 (1996). When reason exists to suspect a negligent act and when information exists from which negligence can be determined, the limitations period will start. See 259 Kan. at 675-76. In other words, "Kansas' 'fact of injury' standard postpones the running of the limitations period until the time the plaintiff is able to determine that [his or her] injury may be caused by some act of the defendant." *Benne v. International Business Machines Corp.*, 87 F.3d 419, 427 (10th Cir. 1996).

The use of the phrase "substantial injury" in K.S.A. 60-513(b) does not require the injured person to have knowledge of the full extent of his or her injuries, but the person must have a "sufficient [reasonably] ascertainable injury to justify an action for recovery of damages." 236 Kan. at 222. " 'The true test to determine when an action accrues is that point in time at which the plaintiff could first have filed and prosecuted his action to a successful conclusion.' [Citation omitted.]" *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 116, 936 P.2d 714 (1997). Both the act and resulting injury must be reasonably ascertainable to the injured party. *Roe*, 236 Kan. at 222.

If examining the surrounding circumstances shows that the plaintiff clearly has knowledge of his or her injury and that the defendant was the likely cause, the trial court can make the legal determination that the injury was reasonably ascertainable at that point. See *Lehmann v. Young*, No. 97,602, 2007 WL 3146699, at *6 (Kan. App. 2007) (unpublished opinion). But if the trial court finds the evidence is in dispute as to when substantial injury first appeared or became reasonably ascertainable, the issue is for determination by the trier of fact. *Gilger*, 249 Kan. at 311.

### Underlying Facts

Michaelis testified that when he jumped in the water his body shook with electricity; his arms would not move to bring him back

to the surface; and he was afraid he would drown. On cross-examination, defense counsel asked Michaelis if feeling the electrical current running through his body was painful. Michaelis answered, "Yes." When asked about this answer on redirect, Michaelis stated, "It wasn't pain like excruciating pain. It was . . . discomfort." Emergency medical personnel arrived and checked Michaelis' vital signs, which were normal. They wanted to take Michaelis to the hospital as a preventative measure, but he refused. Michaelis had been around people who had suffered electrical shocks, and he knew he had not suffered any injury typically seen from an electrical shock. Immediately after the accident, Michaelis' stepfather saw him standing up in the water and he asked Michaelis if he was okay. Michaelis said he was okay. Michaelis' stepfather further testified that Michaelis lifted the dog out of the water and that the dog weighed around 100 pounds.

When Michaelis returned to work after the accident, he admitted he was afraid when it came time to work on "hot" electrical panels, describing it as being "gun-shy." Over time he began having trouble with his memory, focusing, and reading blueprints. He thought he might be having problems with his eyes and that he might be developing diabetes. When his symptoms became progressively worse, he investigated those problems by seeking medical advice. He was referred to Dr. Wurster. Michaelis testified that he told Dr. Wurster he had had those difficulties since the time of the electrical shock, but Dr. Wurster dismissed the suggestion that his condition was caused by the accident. According to Michaelis, Dr. Wurster finally referred him to Dr. Isaacson for further investigation because medication had not ameliorated the symptoms. Michaelis testified that Dr. Isaacson told him that he had suffered a physical brain injury as a result of the electric shock.

Dr. Wurster testified that he first saw Michaelis in March 2007. Michaelis was complaining of severe overwhelming anxiety, depression, memory problems, and difficulty reading blueprints. Michaelis reported he could no longer supervise people at work, and he was not able to follow directions like before. Dr. Wurster testified that Michaelis told him about the electrical shock, and Dr. Wurster thought it had something to do with Michaelis' problems,

but it was not until late 2009 that Dr. Wurster diagnosed Michaelis with posttraumatic stress disorder brought on by the electric shock. When Dr. Wurster was asked if this was the first time he had relayed to Michaelis that he believed Michaelis' problems were due to the electrical shock, he answered:

"I probably made it more clear then. Initially, when I saw him over the months, I wasn't—I don't·know anything about electricity, so it was hard for me to understand the severity of the shock. And I didn't understand that, and, therefore, I didn't want to jump to that conclusion. But over time it became more and more obvious that that could be the problem—part of the problem, and, therefore, I recommended he investigate it more."

That was when Dr. Wurster referred Michaelis to Dr. Isaacson.

Dr. Isaacson testified that she first saw Michaelis in February 2010. At that time, he was complaining of multiple symptoms—memory issues, anxiety, inability to concentrate, and difficulty with problem solving. Michaelis reported he noted those problems after receiving a large dose of electricity, but he thought it might simply be part of being depressed and was concerned that the depression had not remitted. After testing Michaelis and reviewing medical research, Dr. Isaacson testified that she concluded that Michaelis had a disruption in the way his· brain cells communicate and that these changes were brought on by the electric shock.

Dr. Isaacson explained that brain injuries from electrocution are different than traumatic brain injuries. As opposed to traumatic brain injuries, which cause immediate injury and get better over time, electrical shock injuries to the brain are insignificant initially and worsen over time, particularly around the fourth or fifth year. Dr. Isaacson further explained that electrical shock injuries to the brain cause cognitive functions to deteriorate over time, including increased memory and attention problems and difficulty regulating emotions. In the spring of 2010, Dr. Isaacson diagnosed Michaelis with injury to his brain caused by the electrical shock.

*Arguments*

The Farrells repeatedly assert that Michaelis suffered substantial or actionable injury on July 2, 2005, because he knew he had suffered an electric shock when he entered the water and, immedi-

ately thereafter, Michaelis experienced paralysis, pain, fear, anxiety, and emotional distress. The Farrells note that the trial court relied on *Gilger*, but they contend that case is distinguishable because the plaintiffs in *Gilger* suffered symptoms at various times from carbon monoxide exposure but were unaware of the cause for many years. The Farrells argue that Michaelis was aware he was receiving an electric shock when it was occurring and he was equally aware of the symptoms he experienced as a result of the shock. According to the Farrells, the only delayed aspect of Michaelis' case was the formal diagnosis made by Dr. Isaacson; Michaelis knew or reasonably should have ascertained that the electric shock caused his injuries. In that respect, the Farrells contend that this case is similar to *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1980), and *Roe*, 236 Kan. 218.

In *Gilger*, within a year of moving into their home, the plaintiffs began experiencing health problems and suspected, at least in part, that gas in the house was the source of their problems. Over the years, the furnace was repeatedly checked for gas or carbon monoxide leaks, but none were found. About 4 years after moving into the house, an inspection of the furnace showed it was improperly vented. The plaintiffs thereafter filed a negligence action, claiming they did not discover their health problems were caused by the furnace until the inspection showed it was improperly vented. The trial court granted summary judgment in favor of the defendants, concluding that the plaintiffs knew or could have reasonably ascertained before the 2-year statute of limitations that their injuries were caused by the defendants' negligent acts.

On appeal, the appellees argued that the appellants became aware of their problems shortly after they moved into the house because they sought medical treatment for their symptoms and were periodically suspicious of gas in the house. The appellants admitted they were aware they were suffering substantial health problems, but they did not know the nature and cause of their problems until they were told the furnace was installed without proper venting.

As did the Farrells, the appellees in *Gilger* relied on *Friends* and *Roe*. Our Supreme Court ruled that their reliance on *Friends* and

*Roe* was misplaced. *Gilger*, 249 Kan. at 321. In *Friends*, the plaintiff's new roof began to leak soon after it was installed. The plaintiff complained to the roofing company. At some point the roofing manufacturer became involved and attempts were made to repair the roof. About 4 or 5 years after the roof first started leaking, the plaintiff retained an expert, who determined the manufacturer was at fault. The plaintiff brought an action within 2 years of the expert's report but well beyond the 2-year statute of limitations. Our Supreme Court determined that the plaintiff's failure to know the exact scientific nature of the problem did not toll the statute of limitations when it was clearly apparent when the roof first started leaking that there was a problem with the roof caused by a defective design, materials, or workmanship. 227 Kan. at 563, 565.

In *Roe*, the plaintiff was in a car accident and suffered a back injury that caused pain and required him to be laid off work for several days. Plaintiff did not file suit, however, until he reinjured his back over 2 years later. Plaintiff argued that he did not realize the full extent of his injuries until then. Our Supreme Court ruled that the action accrued when the plaintiff sustained sufficient ascertainable injuries to justify an action for damages regardless of the extent of the injuries. 236 Kan. at 222-23.

The *Gilger* court distinguished both *Friends* and *Roe* because in those cases the party whose negligence caused the injuries was immediately known and the injuries were ascertainable within a short period of time. 249 Kan. at 322. Although the *Gilger* court acknowledged that the appellants knew they were ill long before they filed suit and that they suspected carbon monoxide gas poisoning, the court noted that the appellants received different opinions on the cause of their symptoms and stated: "Injury and damages alone are not sufficient for the accrual of a negligence action. Establishing when the facts of injury were reasonably ascertainable is an essential element in determining when a tort action accrued." 249 Kan. at 322. Because the evidence was controverted as to when the appellants' injuries were reasonably ascertainable and when the cause of the injuries was determined, the *Gilger* court ruled that a material question of fact existed that should be resolved by a jury. 249 Kan. at 322.

The surrounding circumstances of Michaelis' case are more similar to *Gilger* than either *Friends* or *Roe*. Contrary to the Farrells' assertions, when viewing the evidence in a light favorable to Michaelis, the evidence indicates that no actionable injury existed on July 2, 2005. Michaelis did not believe he suffered any injury at that time and, by all appearances, he had no physical or acute injury immediately after the electric shock. At some point Michaelis knew he was having difficulties with memory, concentration, anxiety, and depression, and he suspected his problems were related to the electric shock. Moreover, Michaelis investigated the symptoms that he was experiencing by seeking medical help. But, as explained earlier, Dr. Wurster initially dismissed any connection between Michaelis' symptoms and his electric shock. Arguably, unlike *Friends* or *Roe*, Michaelis did not know that his injury was associated with the electrical shock until late 2009 or early 2010 when Dr. Isaacson told Michaelis that his test results and problems were consistent with electrical injuries to the brain. The statute of limitations commenced running at that time. Accordingly, Michaelis' claims would have to be brought no later than late 2011 or early 2012 for his claims not be be barred by the 2-year statute of limitations. Because Michaelis filed his cause of action on July 2, 2010, the applicable 2-year statute of limitations did not bar his claims.

The evidence was controverted as to when Michaelis' injury was reasonably ascertainable and the cause of the injury was determined. We draw some guidance from *Hall v. Miller*, 29 Kan. App. 2d 1066, 1073, 36 P.3d 328 (2001). In *Hall*, the court pointed out that when dealing with mental conditions, bright-line events may not be present under K.S.A. 60-513(b). Accordingly, the trial court properly submitted the question to the jury and properly denied the Farrells' motion for a directed verdict and motion for judgment as a matter of law.

*Did the trial court err in denying the Farrells' motion for new trial because jury instruction 8 misstated the law under K.S.A. 60-513(b)?*

The Farrells filed a motion for new trial arguing the trial court's jury instruction regarding K.S.A. 60-513(b) was a misstatement of the law because it failed to define "substantial injury."

Jury instruction 8 stated: "If you find any fault on defendants and that plaintiff has sustained damages, you must determine on the verdict form the date when plaintiff reasonably ascertained that he had suffered a substantial injury related to the electric shock received on July 2, 2005."

On appeal, the Farrells contend this instruction misstated Kansas law because (1) it ignored the "threshold standard" language that would have allowed the jury to find Michaelis suffered substantial injury on July 2, 2005; (2) the trial court should have defined the phrase "substantial injury" in a manner consistent with *Roe* or used the phrase "ascertainable injury" or "any injury"; and (3) the instruction provided the jury with a subjective standard instead of an objective standard.

Michaelis contends that the Farrells did not properly object to jury instruction 8. According to Michaelis, the Farrells indicated they were agreeable to the instruction but wanted an additional instruction defining the word "substantial"; but they never proposed a definition. Michaelis further contends that the Farrells are not just claiming the instruction was incomplete but now, for the first time on appeal, maintain that the instruction misstated the law in ways they never mentioned below. The Farrells disagree and assert their objection was not a request for a jury instruction but an objection that instruction 8 misguided and misled the jury. Accordingly, they contend that their objection did not require a supplemental instruction.

### Underlying Facts

Before the jury instruction conference, the Farrells submitted an instruction that read: "Your verdict must be for the defendants if you believe plaintiff had an ascertainable injury arising from the incident at issue, regardless of the extent, prior to June 2, 2008."

On the record, defense counsel made the following statements regarding the trial court's proposed instruction on this issue.

"THE COURT: . . . Anything else anybody else wants to state regarding the instructions?

"MR. BARTALOS [Defense Counsel]: Judge, I think that we believe that 'substantial' should be defined or that it should be 'any injury' subject to *Roe*.

"THE COURT: I think that folks in a lay jury can figure out what the word 'substantial' means—

"MR. BARTALOS: Okay.

"THE COURT: —and 'reasonable' and 'ascertainable.'

"MR. BARTALOS: Okay.

"THE COURT: I think those are common English language words. I don't think we need to lawyer that up."

A little later, the trial court asked the parties if, after having seen the final draft of the jury instructions, they had any other objections. Defense counsel stated:

"And Instruction No. 8 and the verdict form, we believe the use of the word, quote, substantial, unquote, injury is improper without being defined pursuant to the *Roe* decision that we've discussed; and to that extent believe it's misguiding and misleading this jury in their determination and, therefore, the defendant is prejudiced."

*Analysis and Standard of Review*

K.S.A. 2012 Supp. 60-251(c) states that "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection."

The above exchange between the trial court and defense counsel could fairly be interpreted as an objection to the trial court's instruction regarding K.S.A. 60-513(b). Assuming the Farrells properly objected, the standard of review is as follows:

" 'It is the duty of the trial court to properly instruct the jury upon a party's theory of the case. Error regarding jury instructions will not demand reversal unless it results in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal.' [Citation omitted]" *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 383, 266 P.3d 516 (2011).

Here, the Farrells asked for a definition of "substantial" consistent with *Roe*. *Roe* found there cannot be a legal distinction between an unsubstantial injury and a substantial one. Thus, the *Roe* court construed the phrase to mean "actionable injury." 236 Kan. at 222-23. But still, defense counsel's offer of the phrase "any in-

jury" may not have conveyed the appropriate standard. See *Olson v. State Highway Commission*, 235 Kan. 20, 26-27, 679 P.2d 167 (1984) (finding the initial injury was not necessarily substantial enough to trigger the running of the statute of limitations, reasoning that parties should not be "forced into court at the first sign of injury, regardless of how slight it might be"). Further, as Michaelis contends, the use of the phrase "actionable injury" would have asked the jury to form a legal conclusion. There was no PIK instruction available, but in this case it seems the trial court attempted to follow the language of K.S.A. 60-513(b) by using the term "substantial injury," which would have allowed the jury to find Michaelis suffered his injury on July 2, 2005 (Farrells' alleged threshold standard) or anytime after that.

The Farrells also argue that the jury instruction asked the jury to use a subjective standard rather than an objective standard. They contend the instruction should have asked when the injury was reasonably ascertainable to Michaelis, not when Michaelis reasonably ascertained the injury. Michaelis asserts that this was the language found appropriate in *Gilger* and, additionally, by using the term "reasonably," it was clear the jury was asked to use an objective standard. The Farrells did not object to the instruction on this ground; however, the instruction asked the jury to determine when Michaelis "reasonably" ascertained his injury, which would satisfy the objective requirement.

Jury instruction 8 was a substantially correct statement of the law, and the jury was not misled. Throughout the trial the Farrells tried to emphasize that Michaelis suffered an injury on July 2, 2005. Because the jury rejected that premise, instruction 8 did not prejudice the Farrells.

Affirmed.