NOT DESIGNATED FOR PUBLICATION

No. 119,114

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALMA VELASQUEZ,
*Appellant*,

v.

RAYMOND LEIDICH, M.D.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Meade District Court; E. LEIGH HOOD, judge. Opinion filed November 16, 2018. Reversed and remanded with directions.

*Larry G. Michel* and *Klint A. Spiller*, of Kennedy Berkley Yarnevich & Williamson, Chartered, of Salina, for appellant.

*Josh D. Becker* and *Brian L. Burge*, of Sanders Warren Russell & Scheer LLP, of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., GREEN, J., and ROBERT J. FREDERICK, District Judge, assigned.

PER CURIAM: Dr. Raymond Leidich performed surgery on Alma Velasquez on November 6, 2012. Alma Velasquez sued Dr. Leidich for medical malpractice on November 4, 2016. Dr. Leidich moved for summary judgment, arguing Velasquez' claim was time barred under the two-year statute of limitations. The trial court granted Dr. Leidich's motion for summary judgment on that basis. On appeal, Velasquez argues that the trial court erred in granting Dr. Leidich's motion for summary judgment because her

1

injury was not reasonably ascertainable until she underwent a second surgery with a different doctor in September 2015.

Because Dr. Leidich moved for summary judgment, the burden was on Dr. Leidich to show that no disputed fact existed as to when Velasquez' injury became reasonably ascertainable. The record shows that both Velasquez and Dr. Leidich disputed when Velasquez' injury became reasonably ascertainable. We conclude that the trial court improperly construed the disputed evidence as to when Velasquez' injury became reasonably ascertainable in favor of Dr. Leidich, the moving party, which is not permitted under a motion for summary judgment. In addition, we point out that when "the evidence is in dispute as to when substantial injury first appears or when it becomes reasonably ascertainable, the issue is for determination by the trier of fact." *Jones v. Neuroscience Assocs., Inc.*, 250 Kan. 477, 486, 827 P.2d 51 (1992). As a result, we reverse and remand this matter for trial.

Velasquez sought care from Dr. Leidich for ongoing stomach pain and incontinence. Dr. Leidich diagnosed Velasquez with a fallen bladder. Dr. Leidich recommended a pelvic floor reconstruction.

Before surgery, Dr. Leidich explained to Velasquez that the surgery "would likely" keep her from having incontinence accidents in the future. Dr. Leidich told Velasquez that the operation could treat her stomach pain. Dr. Leidich also explained that the surgery could result in complications. Before surgery, Velasquez did not know that her symptoms may not be entirely resolved by the operation.

Dr. Leidich performed a pelvic floor reconstruction surgery on Velasquez on November 6, 2012, to treat this condition. Velasquez continued to experience incontinence and pain after the surgery. The surgery alleviated "very little" of the pain Velasquez was experiencing prior to the operation. Velasquez also experienced pelvic

2

pain after the surgery. She continued to see Dr. Leidich for her symptoms. She told Dr. Leidich about the pain but not the incontinence. Dr. Leidich told Velasquez that, despite her complaint about ongoing pain, everything was fine.

After Dr. Leidich told Velasquez that everything was fine, Velasquez went to another care provider, the Women's Clinic. This was about two months after the surgery. At this time, Velasquez believed Dr. Leidich had done something wrong during surgery. Nevertheless, Velasquez continued to see Dr. Leidich for her symptoms until October 2013. After October 2013, Velasquez could no longer see Dr. Leidich because he stopped practicing in Garden City. At some point between 2013 and 2015, Velasquez complained to the Women's Clinic about a problem with vaginal discharge. The Women's Clinic told Velasquez that the discharge was caused by an infection, but "it wasn't anything to worry about." The Women's Clinic referred Velasquez to the Siena Medical Clinic for the infection. The Women's Clinic also referred Velasquez to a specialist, Dr. Edgar Leclaire, for her continuing pain and incontinence.

Dr. Leclaire performed surgery on Velasquez on September 3, 2015. During surgery, Dr. Leclaire found that Velasquez' bladder was over her ovary, her bladder was loose, and she had vaginal scar tissue that would need to be removed with a laser. Dr. Leclaire found that Dr. Leidich had used metal staples and left a net inside of Velasquez that was the cause of her yellow bloody vaginal discharge. Dr. Leclaire told Velasquez that Dr. Leidich had done a bad job during the initial pelvic floor reconstruction.

Velasquez filed a medical malpractice suit against Dr. Leidich on November 4, 2016. She then voluntarily dismissed the case and refiled it on January 23, 2017. Dr. Leidich answered Velasquez' complaint and raised the statute of limitations as a defense. Dr. Leidich deposed Velasquez. After the deposition, Dr. Leidich moved for summary judgment, arguing that the two-year medical malpractice statute of limitations barred Velasquez' claim. Velasquez opposed the motion, arguing that the statute of limitations

3

was tolled until September 3, 2015, because her injury was not reasonably ascertainable until she underwent the subsequent surgery with Dr. Leclaire. The trial court held a hearing on the motion.

The trial court granted Dr. Leidich's motion for summary judgment, holding that Velasquez' injury was ascertainable well before November 4, 2014, the earliest date of the two-year statute of limitations in this case. The trial court held that Velasquez' ongoing symptoms and new pain triggered a duty for her to investigate, and that she did not investigate properly. Accordingly, the trial court held that Velasquez' claims against Dr. Leidich were time barred. Velasquez timely appealed.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Stechschulte v. Jennings*, 297 Kan. 2, Syl. ¶ 2, 298 P.3d 1083 (2013). The party opposing summary judgment must offer evidence to establish a dispute as to a material fact. 297 Kan. at 14. When ruling on a motion for summary judgment, the court must resolve all facts and reasonable inferences in favor of the party opposing summary judgment. 297 Kan. 2, Syl. ¶ 2. The trial court judge may not decide disputed issues of material fact on summary judgment. 297 Kan. 2, Syl. ¶ 1. The trial court judge also must not assess credibility or balance and weigh evidence, as these functions are reserved for the fact-finder at trial. *Esquivel v. Watters*, 286 Kan. 292, 295-96, 183 P.3d 847 (2008). When "'reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.'" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009). Appellate courts review summary judgment rulings de novo, applying the same standard. *Hare v. Wendler*, 263 Kan. 434, 439, 949 P.2d 1141 (1997). "Summary judgment is seldom appropriate in negligence cases," including medical malpractice cases. *Esquivel*, 286 Kan. at 296.

4

Once a defendant establishes a prima facie showing that plaintiff filed her claim outside the statute of limitations, the plaintiff bears the burden of "demonstrating facts justifying the tolling of the limitations period in order to survive summary judgment." *Underhill v. Thompson*, 37 Kan. App. 2d 870, 875, 158 P.3d 987 (2007). Medical malpractice claims are subject to a two-year statute of limitations. K.S.A. 60-513(a)(7). The statute of limitations does not begin to run "until the fact of injury becomes reasonably ascertainable to the injured party." K.S.A. 60-513(c). This means the statute of limitations is tolled "'until the time the plaintiff is able to determine that [his or her] injury may be caused by some act of the defendant.'" *Michaelis v. Farrell*, 48 Kan. App. 2d 624, 631, 296 P.3d 439 (2013) (quoting *Benne v. International Business Machines Corp.*, 87 F.3d 419, 427 [10th Cir. 1996]). Further, "'the true test to determine when an action accrues is that point in time at which the plaintiff could first have filed and prosecuted his action to a successful conclusion.'" *Michaelis*, 48 Kan. App. 2d at 631 (quoting *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 116, 936 P.2d 714 [1997]). "[W]here the evidence is in dispute as to when substantial injury first appears or when it becomes reasonably ascertainable, the issue is for determination by the trier of fact*." Jones v. Neuroscience Assocs.*, 250 Kan. at 486.

"Reasonably ascertainable," as used in the medical malpractice statute of limitations, requires an "objective standard based on an examination of the totality of circumstances." *Hall v. Miller*, 29 Kan. App. 2d 1066, Syl. ¶ 2, 36 P.3d 328 (2001). These circumstances include both the plaintiff's own knowledge and reasonable interpretation of her condition, and what physicians told the plaintiff about her condition. See, e.g., *Hall*, 29 Kan. App. 2d at 1071 ("Significantly, it must be remembered that any reservations expressed by Hall as to the reliability of Miller's diagnosis were rebuffed by her physician.").

Here, Dr. Leidich performed surgery on Velasquez on November 6, 2012. Velasquez filed a medical malpractice suit against Dr. Leidich on November 4, 2016. She

then voluntarily dismissed the case and refiled it on January 23, 2017. More than two years lapsed between the initial surgery and when Velasquez first filed suit.

In his motion for summary judgment, Dr. Leidich made a prima facie showing that Velasquez filed her claim outside the statute of limitations. The burden thus shifted to Velasquez to show that the statute of limitations was tolled. In her opposition to Dr. Leidich's motion for summary judgment, Velasquez argued that her injury was not reasonably ascertainable and, thus, the statute of limitations did not begin to run, until Dr. Leclaire performed the second surgery in September 2015. In compliance with Supreme Court Rule 141 (2018 Kan. S. Ct. R. 205), Dr. Leidich and Velasquez both addressed a list of "uncontroverted facts" submitted by Dr. Leidich. Velasquez also offered "additional material facts" that the trial court considered.

Supreme Court Rule 141 requires a party moving for summary judgment to lay out, in separate numbered paragraphs, the uncontroverted facts that support its motion for summary judgment. It also requires the party opposing summary judgment to provide a response to the movant's list of uncontroverted facts. The party opposing summary judgment must submit a list, corresponding in number to the list submitted by the movant, stating whether each of the movant's factual contentions are (a) uncontroverted, (b) controverted for the purposes of the motion only, or (c) controverted. If the party opposing summary judgment does not so respond and claim a fact is actually controverted, the fact is deemed admitted. See *David v. Hett*, 293 Kan. 679, 681, 270 P.3d 1102 (2011).

Supreme Court Rule 141 does not, however, state that the party opposing summary judgment is prohibited from raising additional facts outside of those cited in its response to the movant's statement of uncontroverted facts. In fact, our Supreme Court has held that "substantial compliance" with Rule 141 is sufficient; parties do not need to show strict technical compliance to comply. *Rhoten v. Dickson*, 290 Kan. 92, 103-05, 223

6

P.3d 786 (2010). Here, Velasquez agreed that all but two of Dr. Leidich's 21 submitted facts were uncontroverted. She claimed two were controverted, only one of which is relevant here. Dr. Leidich's fact number 18 was "[t]he pain Ms. Velasquez started experiencing shortly after the surgery performed by Dr. Leidich was a new symptom that she felt was caused by the operation." In her opposition, Velasquez controverted this fact, writing she "experienced pain after the surgery in November of 2012 but she did not think that the pain she was experiencing was caused by the surgery in November of 2012." She properly cited to her deposition testimony in support of this argument.

Beyond addressing Dr. Leidich's submitted statements of uncontroverted fact, Velasquez also submitted eight "additional material facts," including accurate citations to the record. During the hearing on the issue, the trial court seemed to accept these "additional material facts" as part of Velasquez' submission of uncontroverted facts. For example, Velasquez' attorney stated: "Alma testified that she did not believe the pain she was experiencing was caused by the surgery by Dr. Leidich. And, that was on [disposition] page 35, lines four to six." The court responded: "Do you agree you didn't set that out, though, as one of your uncontroverted statements of fact? You just—" Velasquez' attorney: "No, no I—I—that's in Number 6." The court: "Number where?" Velasquez' attorney: "Six in our response." The court: "All right." This constitutes "substantial compliance" with Rule 141. Moreover, Dr. Leidich did not challenge the court's acceptance of these "material facts" on appeal.

After reviewing the parties' motions, including their discussion of uncontroverted facts, and hearing argument from both parties, the trial court ruled from the bench and awarded Dr. Leidich summary judgment. The judge relied on three primary reasons for his finding that Velasquez' injury was, as a matter of law, reasonably ascertainable more than two years before she filed suit. First, the judge stated, "From the uncontroverted facts, it appears to me that Ms. Velasquez believed approximately two months after the first surgery . . . that Dr. Leidich had done something wrong during the surgery." Second,

7

Velasquez experienced a "new symptom of pain," which, along with the continuation of her presurgery symptoms "would trigger her duty to investigate further." Third, according to the court, Velasquez did not "reasonably investigate" her continuing symptoms and new symptom.

Accordingly, the trial court concluded "although I cannot set a definite date as to when it was reasonably ascertainable . . . it does appear to me that had she investigated properly, that would have been prior to the two years before this case was actually filed in November of 2016." The trial court therefore granted Dr. Leidich summary judgment, ruling that Velasquez' claims were time barred.

Nevertheless, the uncontroverted facts show that two of the three reasons cited by the court for its finding are actually disputed, and the third is susceptible to a different interpretation favorable to Velasquez. Courts are not permitted to resolve disputed facts or weigh evidence when ruling on summary judgment motions. Courts are also required to make all reasonable inferences in favor of the party opposing summary judgment. Each of the three facts the trial court relied on is addressed in turn below.

*Velasquez believed something was wrong two months postsurgery*

First, the trial court found that "[f]rom the uncontroverted facts, it appears to me that Ms. Velasquez believed approximately two months after the first surgery . . . that Dr. Leidich had done something wrong during the surgery." Dr. Leidich emphasized this point in both his motion for summary judgment and the hearing on the motion. Dr. Leidich cited to the following excerpt from Velasquez' deposition in support of his claim:

"Q: Did you feel, in the two months after the surgery had been performed by Dr. Leidich, that something had been done wrong at that point?
"A: Yes.

8

"Q: Did you have the belief, in that two months after the surgery, that Dr. Leidich had done something wrong?

"THE INTERPRETER: Okay. She had the presentiment that the surgery was not going to work.

"Q: Did you believe that Dr. Leidich had done something wrong during the surgery?

[VELASQUEZ' ATTORNEY]: "Object to form. She can answer.

"A: Yes.

"Q: And is that the reason that you began going to the Women's Clinic in Garden City?

"A: Yes.

"Q: So as of the end of 2012, did you yourself feel like Dr. Leidich had done something wrong in your surgery?

[VELASQUEZ' ATTORNEY]: "Object to form.

"A. Yes."

Velasquez did not controvert Dr. Leidich's uncontroverted fact number 15: "Within two months of the surgery, Velasquez believed that Dr. Leidich had done something wrong during the surgery and that an error was made." Because she did not controvert the fact, the fact is deemed admitted. See *David*, 293 Kan. at 681.

Velasquez did, however, offer a reasonable, alternative interpretation of the deposition testimony amenable to her position that her injury was not reasonably ascertainable in the two months after surgery. She also offered additional material facts in support of this interpretation.

Velasquez argued that the admission "she believed Dr. Leidich had done something wrong" did not mean that she had reasonably ascertained her injury at that point. Rather, she argued, this testimony indicates that Velasquez believed more generally that the surgery was a failure because her original symptoms were not cured. Velasquez experienced pain and incontinence both before and after the surgery with Dr. Leidich; the surgery did not alleviate her symptoms. Velasquez argued that the quoted

9

deposition testimony above indicated that she "knew something was wrong because the surgery didn't work." She further argued that "a reasonable person would have that perspective [that the surgery was done wrong] if the surgery didn't work." Velasquez submitted uncontroverted facts stating that she endured the same symptoms both before and after surgery.

On summary judgment, courts are required to "resolve all facts and reasonable inferences in favor of the party opposing summary judgment." *Stechschulte*, 297 Kan. 2, Syl. ¶ 2. Here, Velasquez offered an alternative explanation for her testimony that is reasonable and does not support Dr. Leidich's interpretation of the testimony. The trial court was therefore required to, for the purposes of summary judgment, make inferences in favor of Velasquez. Because the quoted deposition testimony also lends itself to Velasquez' explanation, the trial court should have credited the conflicting evidence in favor of Velasquez' explanation.

### Velasquez had a "new symptom" of pain postsurgery

The second fact the trial court used as a basis for its summary judgment ruling was that, according to Velasquez' deposition, she experienced a "new symptom of pain," which, along with the continuation of her presurgery symptoms "would trigger her duty to investigate further." Dr. Leidich submitted this claim as his eighteenth uncontroverted fact. He wrote, "[t]he pain Ms. Velasquez started experiencing shortly after the surgery performed by Dr. Leidich was a new symptom that she felt was caused by the operation." Dr. Leidich cited the following excerpt of Velasquez' deposition testimony.

"Q: But the pain that you've been describing, did that start right after the surgery in November of 2012?

"A: Yes.

. . . .

10

"Q: And was that a new symptom that you experienced after the surgery in November of 2012?

"A: Yes, it was a new symptom.

"Q: And did you feel that that symptom was caused by the surgery in November of 2012?

[Velasquez' attorney objects to form, objects that question has been asked and answered].

"A: Yes."

Velasquez, however, controverted this fact. She argued that she "experienced pain after the surgery in November of 2012 but she did not think that the pain she was experiencing was caused by the surgery in November of 2012." She cited to different deposition testimony: "Q: And did you feel that the pain you were experiencing was caused by the surgery in November of 2012? A: I didn't think that, but in—when I had surgery in 2015, they did surgery to take out the things that he had implanted." She also submitted relevant additional material facts that directly controvert the testimony that the pain was a "new" symptom. Specifically, she stated that she "testified that the pain that she was experiencing after the surgery by Dr. Leidich was the same as the pain that she had experienced before the surgery." She cited to the following deposition testimony in support of this argument. "Q: Was the pain that you were experiencing after the surgery in November of 2012 any different than the pain you had experienced before? A: The same."

Velasquez substantially complied with Rule 141 and showed that there was a dispute in the record as to whether the pain she experienced postsurgery was a new symptom. The court, however, impermissibly weighed the evidence and credited one piece of evidence over another. The court concluded that Velasquez experienced a "new symptom of pain." This was error, as courts may not assess credibility, weigh evidence, or decide disputed issues of material fact on summary judgment. See *Stechschulte*, 297 Kan. 2, Syl. ¶¶ 1, 2.

11

*Inadequate investigation*

The final basis for the court's ruling was its conclusion that Velasquez did not conduct a "reasonable investigation" into her continuing symptoms and the new pain. The trial court stated the following:

> "[T]he continuing symptoms and the new pain would trigger her duty to investigate further. This she did not do, although, as she's argued here today, she did seek additional medical care.
>
> "She went to the Women's Clinic, which before me seems to indicate that she may have seen at least one additional doctor. There is no facts before this Court that present that they told her everything was normal, that she didn't need to do anything else.
>
> "To me, and to this Court, that is not a reasonable investigation. Continued pain of the same nature as before the surgery, and new pain afterwards, would trigger in a reasonable person some duty to investigate the cause of that continued pain and new pain. To wait almost three years to do that would be unreasonable in this Court's feeling."

There are multiple problems with the court's ruling that Velasquez failed to adequately investigate as a matter of law. First, the ruling clearly relies on the court's conclusion that Velasquez experienced a "new symptom of pain" after the surgery. For example, the trial court ruled: "Continued pain of the same nature as before the surgery, *and new pain afterwards*, would trigger in a reasonable person some duty to investigate . . . .") (Emphasis added.) As discussed earlier, the issue of whether Velasquez experienced "new pain" after surgery was disputed and it was error for the trial court to resolve this factual dispute in favor of Dr. Leidich, the moving party. It was also therefore error for the trial court to use this resolved factual dispute as the basis for an additional conclusion.

Second, the trial court erred by refusing to consider one of Velasquez' submitted uncontroverted facts relevant to the adequacy of her investigation. Velasquez' additional material fact number seven was "[d]uring her visits with Dr. Leidich after the surgery,

[Velasquez] told him of her continued problems with accidents, and Dr. Leidich told her that everything was normal and that it was okay."

In her motion opposing summary judgment and during the argument on the motion, Velasquez cited *Hecht v. First National Bank & Trust Co.*, 208 Kan. 84, 490 P.2d 649 (1971), in support of her argument that Dr. Leidich's reassurances that everything was "okay" postsurgery weighed against a finding that her injury was reasonably ascertainable. In *Hecht*, our Supreme Court held that a dispute of material fact as to when an injury was reasonably ascertainable prevented summary judgment in a case where a patient had burns caused by radiation treatment more than two years before filing suit, but the patient's doctors assured her that the condition was healing and would go away. 208 Kan. at 92-94.

*Hall v. Miller* effectively recounts the events of *Hecht*. In *Hecht*, a patient received the first of 20 scheduled radiation treatments in January 1966. After the first treatment, the patient complained of a strange "crawling like" sensation. 29 Kan. App. 2d at 1070. Her treating physicians administered a second treatment. After the second treatment, the treating physicians determined the patient had suffered an abnormal skin reaction to the first treatment. They nonetheless administered four more reduced treatments before discontinuing radiation altogether because of the patient's skin reaction. Two weeks after the last treatment, the treating physicians again examined the patient; they told her the adverse skin reaction was subsiding. Two weeks after the consultation with the treating physicians, the patient consulted with a different doctor. This doctor confirmed the treating physicians' diagnosis.

Finally, in December 1966, yet a different doctor told the patient that the skin reaction was not subsiding: it was an ulcer caused by radiation, and it would not heal without surgical intervention. The patient filed a medical malpractice suit against her original treating physicians in March 1968. The trial court granted summary judgment for

13

the defendants, finding that the fact of injury was reasonably ascertainable to the patient before March 1966, and the patient had "'full knowledge of the fact of the burn injury and its progression to ulceration'" before March 1968. 29 Kan. App. 2d at 1071. Our Supreme Court reversed, holding that none of the doctors deposed in the case had diagnosed the patient's condition before March 1966, because "it was too early to do so with reference to the time of the treatments and the healing condition of [the patient] at the time." The court further wrote that "[w]e do not believe that [the patient's] knowledge of her condition from her own observation, *and that acquired from her physicians,* is sufficient to justify a determination, as a matter of law, that she knew or could have reasonably ascertained" her injury as of March 1966. (Emphasis added.) *Hecht*, 208 Kan. at 92. The court held that summary judgment on the statute of limitations in *Hecht* "necessitated a finding of fact" that was actually disputed. 208 Kan. at 92.

Here, the trial court rejected Velasquez' comparison to *Hecht*. The judge stated:

"THE COURT: Wasn't *Hecht* also, if I remember reading it correctly, dealt with her physicians and care providers telling her everything—that it was going to clear up and everything was okay?
[Velasquez' Counsel]: "Yes, but—
"THE COURT: We don't have that here.
[Velasquez' Counsel]: "Dr. Leidich did communicate those things to her, though.
"THE COURT: You didn't point that out in your response as an uncontroverted fact, and you have the burden."

The trial court was incorrect. Velasquez submitted the fact that Dr. Leidich assured her everything was fine postsurgery as one of her "additional material facts." Our Supreme Court precedent establishes that similar assurances by doctors create a dispute as to when a patient's injuries were reasonably ascertainable. By ruling that Velasquez' investigation was "inadequate" as a matter of law, the trial court must have either rejected her evidence about Dr. Leidich's assurances, or weighed the evidence of Dr. Leidich's assurances against other evidence in the record and determined that Dr. Leidich's evidence in favor

14

of reasonably ascertainability outweighed Velasquez' proffered evidence. Either way, the trial court erred. The trial court may not balance or weigh evidence at summary judgment in this way. This role is reserved for the fact-finder at trial. *Esquivel*, 286 Kan. at 295-96. "[W]here the evidence is in dispute as to when substantial injury first appears or when it becomes reasonably ascertainable, the issue is for determination by the trier of fact." *Hecht*, 208 Kan. at 93.

In summary, the trial court's finding that Velasquez' investigation was inadequate as a matter of law sets an unreasonably high bar. The uncontroverted facts before the court included: (1) Velasquez asked Dr. Leidich about her ongoing symptoms after the surgery. He told her that everything was normal. (2) Unsatisfied with Dr. Leidich's claim that "everything was normal" when she was still in pain and having accidents, Velasquez went to the Women's Clinic. Despite treatment at the Women's Clinic, Velasquez continued to endure pain until her next surgery in 2015. (3) It was not until the next surgery in 2015 that a third doctor found a net inside Velasquez that Velasquez claims Dr. Leidich erroneously left inside after surgery.

The statute of limitations does not begin to run "'until the time the plaintiff is able to determine that [his or her] injury may be caused by some act of the defendant.'" *Michaelis v. Farrell*, 48 Kan. App. 2d at 631. Further, "'[t]he true test to determine when an action accrues is that point in time at which the plaintiff could first have filed and prosecuted his action to a successful conclusion.'" 48 Kan. App. 2d at 631.

Here, Velasquez complained of continued symptoms to her treating physician, Dr. Leidich. He told her that what she was experiencing was normal. Dissatisfied with this answer, she went to a different doctor at the Women's Clinic, again seeking aid with her symptoms of pain and incontinence. After treating with the Women's Clinic unsuccessfully, Velasquez finally saw a third doctor who performed surgery and, according to Velasquez, Dr. Leclaire found a net Dr. Leidich erroneously left inside

15

Velasquez' vagina. Could Velasquez have "filed and prosecuted her action to a successful conclusion" before the third doctor found the net? See *Michaelis*, 48 Kan. App. 2d at 631. Likely no.

The uncontroverted facts show that Dr. Leidich told Velasquez before the surgery that there could be complications with the surgery and that the surgery would only "likely prevent accidents from occurring in the future." Dr. Leidich's statement that accidents would "likely" be prevented implied that there was a chance that the symptoms would nevertheless continue. Had Velasquez filed suit before the second surgery where Dr. Leclaire discovered the net and observed what he believed to be substandard surgical work from Dr. Leidich, she most likely would have failed to show causation, one of the critical elements of a medical malpractice claim. See *Miller v. Johnson*, 295 Kan. 636, 683, 289 P.3d 1098 (2012). Before the second surgery, all the uncontroverted facts show is that Velasquez experienced the same symptoms before and after her operation by Dr. Leidich and that the continuation of her symptoms was one of the possible surgery outcomes Dr. Leidich had predicted. It is very unlikely that Velasquez could have successfully prosecuted her medical malpractice claim on those facts alone.

In conclusion, the trial court improperly applied the summary judgment standard by resolving disputed issues of fact and failing to make all reasonable inferences in favor of Velasquez, the moving party.

Reversed and remanded for trial.